IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| JOHN I. SHAFFRAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 04-0285-CV-W-SWH |
| | ) |
| LUCENT TECHNOLOGIES, INC., | ) |
| | ) |
| | ) |
| Defendant. | ) |

ORDER

I. BACKGROUND

Plaintiff, John Shaffran, was a participant in the Lucent Technologies, Inc. Long Term Savings and Security Plan (hereinafter "the Plan") which is an employee-benefit plan subject to the provisions of ERISA. On July 27, 2000, plaintiff telephoned Fidelity Institutional Investments Operations Company (hereinafter "Fidelity"), the servicing agent for the Plan, and asked to move $100,664.35 held in his Plan account from the Stable Value Fund (SVF) to the Employer Shares Fund II (ESF II).[1] In August of 2000, when plaintiff attempted to use the on-line investment management system to transfer additional funds from the SVF to the ESF II, he was unable to complete the transaction. Plaintiff then called Fidelity and was advised that only employer contributions could be held in the ESF II. During this call, plaintiff informed Fidelity that he had previously transferred employee contribution to the ESF II. At that time, plaintiff was told that the company would investigate and contact him concerning the results of the investigation. On

---

[1] Of this amount, $79,260.91 was employee contributions. This transfer resulted in the purchase of 2,517.867 ESF II shares at $39.98 per share. Of the 2,517.867 shares purchased, 1,982.514 were shares purchased with plaintiff's employee contributions.

September 26, 2000, Fidelity transferred $51,783.26 from the ESF II to the Lucent Stock Fund (LSF).

Plaintiff filed this lawsuit contending that Lucent ignored and failed to implement his investment instructions.[2] (First Amended Complaint at ¶ 16) At defendant's request, the Court remanded the case to the ERISA Plan Administrator and stayed all further proceedings pending completion of the administrative review process. (Doc. #41) This remand for completion of administrative proceedings was ordered on December 6, 2005.

In a joint status report filed with the Court on March 6, 2006, the Court was advised that the Plan Administrator was exercising its right to take an additional 90 days to complete its review of plaintiff's claim. Following the remand, the parties also attempted to settle this matter. A private mediation was held on June 9, 2006, but the Plan Administrator's decision had not been received at that time. A further mediation was set for August of 2006 which was moved to September of 2006. That mediation was ultimately cancelled because the Plan Administrator's decision had not been issued. As of the date of plaintiff's next status report, February 26, 2007, the Plan Administrator had still not issued a decision. (Doc. #45) During a telephone conference on March 20, 2007, the Court was told that the Plan Administrator had issued a letter denying the claim as of March 16, 2007. The Court was also notified that the plaintiff had 60 days in which to appeal that decision to the Employee Benefits Committee which would then have 60 days in which to rule, which deadline could be extended for an additional 60 days. (See minute entry at doc. #47)

During a telephone conference on October 23, 2007, the Court was advised that the

---

[2]While the First Amended Complaint stated that Fidelity Investments ignored and failed to implement plaintiff's investment instructions, the Court dismissed Fidelity Investments finding that it acted merely as a servicing agent for Lucent, the Plan Administrator.

2

Employee Benefits Committee had met to consider plaintiff's appeal on July 25, 2007. However, the decision of the Committee was first provided to the parties to this lawsuit by letter dated October 18, 2007.[3] There was no explanation offered for the delay between the date of the decision and the notification letter. During the telephone conference between the Court and counsel on October 23, 2007, a schedule for completing discovery and submitting summary judgment briefing was established. Both parties have now filed motions for summary judgment. (See doc. #54 and #56)

## II. SUMMARY JUDGMENT STANDARD

A moving party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A party who moves for summary judgment bears the burden of showing that there is no genuine issue of material fact for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). When considering a motion for summary judgment, a court must scrutinize the evidence in the light most favorable to the nonmoving party and the nonmoving party "must be given the benefit of all reasonable inferences." Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp., 950 F.2d 566, 569 (8th Cir. 1991)(citation omitted).

## III. UNDISPUTED FACTS

Pursuant to Local Rule 56.1(a), all facts set forth in the movant's statement of facts are deemed admitted for the purpose of the summary judgment motion unless specifically controverted by the opposing party. In this case, Lucent did not attempt to controvert, with citations to the record, plaintiff's undisputed facts. Instead, Lucent noted that it disagreed with "some of Shaffran's

---

[3]The Court's notice setting the telephone conference was sent on October 10, 2007.

3

characterizations regarding portions of the Administrative Record ..." (Doc. #61 at 8) These disputed characterizations involved only plaintiff's facts 3, 25, 36, 38, 40 and 42. Defendant's summary judgment motion was supported by facts 1 through 5(a)-(s). Plaintiff specifically controverted eight of defendant's proposed facts. It is clear that both parties believe that the case should be resolved on the basis of the competing summary judgment motions. Not all of the facts set forth by the parties are relevant to resolving the summary judgment motions and the majority of the facts on which the Court relies were undisputed. Thus, the Court will address and resolve a factual dispute only if necessary in deciding the issues before the Court.

## IV. DISCUSSION

### A. The Administrative Process

In December of 2005, the Court granted the defendant's motion to remand to the ERISA Plan Administrator and to stay the court proceedings to allow the parties to exhaust all avenues for administrative review. (Doc. #41) In granting the defendant's motion, which plaintiff opposed, the Court reasoned that without further administrative proceedings, the Court had no record before it on which to review the actions and decisions of the Plan Administrator with respect to plaintiff's claim that his investment directives were ignored and he was thereby damaged. By letter dated March 16, 2007, the Plan Administrator denied plaintiff's claim. (Administrative Record (hereinafter "A.R.") 000200-000204) Plaintiff appealed that decision to the Employee Benefits Committee. The final decision of the Employee Benefits Committee[4] denying plaintiff's claim provided in part:

• In an August 25, 2000 telephone conversation with a representative of

---

[4]See Letter of October 18, 2007. (AR 000097-000099)

4

> Fidelity Investments (the administrator for the LTSSP), Mr. Shaffran was advised that the July 27, 2000 transfer should not have been permitted, and was further advised that he could move the money that had been improperly invested in the ESF II to another investment option contingent upon the completion of Fidelity's investigation into the matter. Mr. Shaffran elected to leave the money in the ESF II.
>
> • By letter dated September 26, 2000, Mr. Shaffran was advised that only company matching contributions can be held in the ESF II and participants are not permitted to exchange money into the ESF II. That letter further advised that, to correct his account, the non-company matching contributions and their related earning in the ESF II had been transferred to the Lucent Stock Fund within his LTSSP account on September 26, 2000.
>
> • In his September 29, 2000 telephone conversation with a representative of Fidelity Investments, Mr. Shaffran was again advised that he could move the money out of Lucent Stock into another LTSSP investment option. Mr. Shaffran elected to leave the money invested in Lucent Stock.
>
> • The ESF II and the Lucent Stock Fund both invest in shares of Lucent Technologies Inc. stock and cash. The main difference between the two funds is administrative. Plan participants may not invest personal contributions in the ESF II; only company matching contributions may be held in the ESF II. Employee investments in Lucent Stock must be directed to the Lucent Stock Fund. The rates of return of the two funds are very similar.
>
> • By the time Mr. Shaffran and Fidelity learned that the July 27, 2000 transaction should not have occurred, the value of the improperly transferred assets had dropped by $9,753.97.
>
> In light of the forgoing, the Committee concluded that restoring the improperly traded assets to Mr. Shaffran's account would be an unwarranted windfall to him, as all contemporaneous records indicate that he intended at that time to invest the assets in Lucent stock. The Committee further determined that the decision to transfer Mr. Shaffran's improperly obtained EFS II shares into the LSF, rather than to void the July 27, 2000 trade, did not cause him any investment losses or other damages. Any investment losses Mr. Shaffran suffered arose directly from choices he made, including the choice to remain invested in funds primarily invested in Lucent stock.

(A.R. 000098-000099)

    B.    <u>Contentions of the Parties</u>

This dispute arose as a result of plaintiff having been allowed to direct money from one fund into another fund that was only for employer matching contributions. According to an internal memorandum, unauthorized transfers occurred as a result of a "systems issue" which allowed 880 participants in the Plan to misdirect $32,000,000 into the ESF I and II between 1998 and 2000. (A.R. 000097-000099; 000138; Plaintiff's Fact #34) To correct what the Employee Benefits Committee referred to as a "technical error," on September 26, 2000, plaintiff's non-company matching contributions and related earnings were transferred from the ESF II to the LSF. (Plaintiff's Fact #35) The issue before the Court is whether that transfer and the Employee Benefits Committee's decision to uphold that action was arbitrary and capricious, and thus, an abuse of discretion.

Defendant argues that the contents of the Administrative Record clearly support Lucent's decision not to allow the July 27, 2000 transaction to continue and to sustain the corrective action taken on behalf of the Plan. (Doc. #55 at 8)[5]

Plaintiff contends that once he became aware that he could not direct money from the SVF into the ESF II, he requested that defendant's agent, Fidelity, return the transferred assets to the SVF. (Doc. #57 at 1) Plaintiff further contends that despite understanding these instructions, defendant's agent transferred the funds into the LSF. (Doc. #57 at 1-2) In support of his claim that his instructions were clear, plaintiff cites the following evidence: During a telephone call on August 25, 2000, plaintiff first learned that the July 27, 2000, transfer of employee contributions to the ESF II fund should not have been allowed. (Plaintiff's Fact #23) When asked what would happen with

---

[5]Lucent argues that the Court is not charged with deciding plaintiff's claim anew and that the only issue before the Court is whether Lucent's claim adjudication was arbitrary and capricious. (Doc. #61 at 8)

6

the transaction, Kevin Dobens, a senior associate with Fidelity, told plaintiff there were a couple of different things that could be done and that he would have to investigate further. (Plaintiff's Fact #22 and #23) Plaintiff's facts also reflect the following:

> In response to Dobens telling him that Fidelity might adjust it for what he originally asked for, Shaffran then stated: "If you tell me it's not allowed, you void the damn thing out, we start from zero. You know? We revert back ..." (Admin.AR 000152).
>
> Dobens understood that Shaffran wanted the transaction voided out and the funds returned to the SVF, as Dobens stated, "I guess at this point, is that you want it to just go back to the way it was, back then." Shaffran responded that he did. (Admin. AR 000153).

(Plaintiff's Fact #24 and #25[6])

> The improper transfer of funds into the ESF II that Fidelity permitted Shaffran to make on July 27th was not the only improper transfer allowed by the Fidelity system. A bulletin to Fidelity customer service representatives advised of a "systems issue" that permitted similar transfers and stated that all such transfers were going to be reversed. The bulletin states:
>
> Bulletin Notice for Fidelity Customer Service Reps:
>
> Situation: A system issue has been detected that allows participants to exchange funds into the Employer Shares Funds. This should not be the case. Systems have been corrected to not allow these transactions anymore. ALL EXCHANGES WHICH WERE ALLOWED ARE GOING TO BE REVERSED. The ESF I & II are only allowed for Company Match money.
>
> Action Required: If participants want to put money into Lucent Stock, have them use the Lucent Stock Fund. Please do not enter Xtrac's on this issue.
>
> Explain to the parts that Fidelity/Lucent are aware of this issue and are working to have these exchanges reversed.

---

[6]Defendant objected to Plaintiff's Fact #25 to the extent it attempted to set forth Mr. Dobens' subjective understanding of plaintiff's intent. However, there appears to be no dispute over the portion of the fact which sets forth Mr. Dobens' statements during that telephone call. Thus, the Court finds that Plaintiff's Fact #25 is supported by the record.

7

(Plaintiff's Fact #33) (A.R. 000328)

Given the undisputed facts, plaintiff argues that "there is nothing in the Plan that permits or authorizes either the Plan administrator or the Plan's representatives to ignore, change or modify as it chooses, the instructions given by a participant with respect to the investment of his or her account." (Doc. #57 at 31) Defendant contends that plaintiff repeatedly demanded that he be restored to his position as of July 26, 2000, which was not an option. (Doc. #55 at 14) According to defendant, plaintiff was unwilling to move his employee contributions out of the ESF II, and thus, the Plan Administrator was forced to take corrective action. (Doc. #55 at 16) Given these circumstances, defendant argues that the actions of the Plan Administrator were not only reasonable, but authorized by the Plan:

> Section 11 of the Plan gives Lucent discretion to "take such other action as it may find necessary or appropriate to implement the provisions of the Plan, consistent with the purposes set forth in Section 1.2." SUF ¶ 3(a). To comply with the Plan's prohibition of employee contributions in the ESF II, a transfer of those assets was necessary, and Shaffran's unwillingness to do it forced the FIIOC [Fidelity] to step into the void. The uncontroverted facts show that Lucent had substantial support of its decision to ratify the corrective action.

(Doc. #55 at 17)

The Court has summarized the positions of the parties to highlight what is not before the Court. In its arguments, defendant has never suggested that because of the number of plan participants who had misdirected funds over an extended period of time, the correction had to be made uniformly and systemwide. In arguments in support of the transfer of funds to the LSF, defendant refers to the specifics of plaintiff's situation, what it believed plaintiff intended and why any other action would constitute a windfall to plaintiff. Thus, neither side asked the Court to determine the reasonableness of the Plan Administrator's actions from the standpoint of the plan

8

participants as a whole.

      C.      Applicable Legal Standard

29 U.S.C. § 1132(a)(1)(B) allows a plan participant to seek to enforce his rights under the terms of a plan. Where a plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of a plan, the administrator's decision is reviewed for the purpose of determining whether there was an abuse of discretion. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Ortlieb v. United HealthCare Choice Plans, 387 F.3d 778, 781 (8th Cir. 2004); Woo v. Deluxe Corp., 144 F.3d 1157, 1160 (8th Cir. 1998). "This deferential standard reflects our general hesitancy to interfere with the administration of a benefits plan." Layes v. Mead Corp., 132 F.3d 1246, 1250 (8th Cir.1998)(citations omitted). Under the abuse of discretion standard, "the proper inquiry is whether the plan administrator's decision was reasonable." Fletcher-Merrit v. NorAm Energy Corp., 250 F.3d 1174, 1179 (8th Cir. 2001)(internal quotations omitted); Finley v. Special Agents Mut. Benefit Ass'n, 957 F.2d 617, 621 (8th Cir.1992)(citing Bruch, 489 U.S. at 111). A plan administrator's fact-based disability decision is reasonable if it is supported by "substantial evidence." See Fletcher-Merrit, 250 F.3d at 1179. The district court will reverse the plan administrator's decision only if it is arbitrary and capricious. See Groves v. Metropolitan Life Ins. Co., 438 F.3d 872, 874 (8th Cir.2006).

Defendant argues the abuse of discretion standard applies because the Plan gives it the power to interpret the Plan. As defendant points out, the Plan specifically provides that defendant has:

> ... full discretionary authority to manage and control the operation and administration of the Plan, including without limitation the power (i) to interpret the provision of the Plan, and to promulgate policies and procedures thereunder, ... and (v) take such other action as it may find necessary or appropriate to implement the provisions of the Plan, consistent with the purposes set forth in Section 1.2.

9

(Defendant's Fact #3a) Citing Woo v. Deluxe Corp., 144 F.3d 1157 (8th Cir. 1998), plaintiff contends that, in this case, where there is an unexplained and unjustified delay in administrative action which constitutes a procedural irregularity and where the Plan Administrator operated under a conflict of interest, greater scrutiny of the Administrator's decisions is allowed under a sliding scale analysis. (Doc. #60 at 1-2)

Recently in Hackett v. Standard Insurance Co., 2009 WL 703235 (8th Cir. Mar. 19, 2009), the Eighth Circuit revisited the Woo sliding scale concept in light of the Supreme Court decision in Metropolitan Life Insurance Co. v. Glenn, 128 S.Ct. 2343 (2008). In Glenn, the Supreme Court emphasized that a conflict of interest does not change the standard of review to be applied in an ERISA action:

> Neither do we believe it necessary or desirable for courts to create special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly upon the evaluator/payor conflict. In principle, as we have said, conflicts are but one factor among many that a reviewing judge must take into account. Benefits decisions arise in too many contexts, concern too many circumstances, and can relate in too many different ways to conflicts-which themselves vary in kind and in degree of seriousness-for us to come up with a one-size-fits-all procedural system that is likely to promote fair and accurate review. Indeed, special procedural rules would create further complexity, adding time and expense to a process that may already be too costly for many of those who seek redress.

128 S.Ct. at 2351. Citing the "combination-of-factors" approach of Glenn, the Eighth Circuit in Hackett remanded that case for reconsideration as the district court had decided the case utilizing the Woo sliding scale analysis. Thus, the parties' dispute over the proper application of the Woo analysis to this case has been resolved by the recent Eighth Circuit opinion.

Many of the cases cited by defendant deal with eligibility for medical or disability benefits or involve plans which give the administrator discretionary authority to determine benefits. This case does not involve eligibility for benefits. The Plan set up specific rules for investing in the Plan

10

and provided that while the company matching contributions were automatically invested in shares of Lucent common stock in the Employer Share Fund (ESF), "[y]ou may invest *your* contributions in one or more of the funds to meet your personal financial goals. And you'll be able to change your investment elections as your needs change." (Doc. #57-2 at 11) The Plan further provided that "'each Participant may direct the investment of his or her Account' and that 'any investment direction shall remain in effect until terminated or modified by the Participant.' (Admin.AR 000041)." (Plaintiff's Fact #11) The Plan also provided a number of investment options and allowed the participants to direct the investment of his or her account, including a "'broad range of investment alternatives ... to allow participants to materially affect the potential return and achieve a portfolio with aggregate risk in return characteristics for their accounts that are generally within the range normally appropriate for participants and beneficiaries in plans similar to the Plan.' (Admin.AR 000041)." (Plaintiff's Fact #12) The summary plan description provided: "'You choose how you want *your* contributions to the LTSSP invested' and 'The LTSSP offers you a choice of investment funds with varying levels of risk and potential for return. You may invest in one or more of the available funds. You choose the investment mix that's right for you.' (Raisher Aff., Ex. A at 32)." (Plaintiff's Fact #13) Available investment options into which Plan participants could direct account assets included the LSF, the ESF II and the SVF. (Plaintiff's Fact #14, citing Raisher Aff., Ex. A at 32-36) The Plan explained the nature of the investments held by each fund. (Plaintiff's Fact #15 and #16) The Plan allowed an active employee to change how the employee's future contributions were invested. (Doc. # 57-2 at 15) The Plan also allowed an employee to:

> ... transfer (exchange) all or part of your existing account balance among one or more of the available funds on a daily basis. All exchanges must be in 5% increments and must meet the following two rules:

11

- You can't transfer money directly from the Stable Value Fund to the Money Market Fund. ...

- Exchanges of balances between either of the Fidelity mutual funds must be for at least $250, or 100 % of the fund balance (if less than $250).

(Doc. #57-2 at 15-16) The Plan instructed participants that to change the investment of future contributions or to exchange existing balances among funds they should:

- Call the Lucent Savings Plan Service Center, or

- Access the **Fidelity NetBenefits** Internet Site at www.401k.com.

(Doc. #57-2 at 16)

While the Plan Administrator is given discretion to take such action as is necessary to implement the provisions of the Plan, at least with respect to the employee's ability to self-direct employee contributions, the Plan provides for little discretion on the part of the Plan Administrator. Thus, the issues raised by plaintiff's lawsuit are considerably different than those raised in cases in which eligibility for benefits is at issue.

In determining if an administrator's decision is supported by substantial evidence or is arbitrary and capricious, the Court must examine all of the facts of record. If procedural irregularities or conflicts of interest are demonstrated, the Court may consider these facts in determining if a reasonable person would have reached a similar decision. As the Court explained in Firestone Tire and Rubber Co v. Bruch., 489 U.S. 101, 115 (1989), "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.' Restatement (Second) of Trusts § 187, Comment *d* (1959)." See Metropolitan Life Ins. Co. v. Glenn, 128 S.Ct. 2343, 2351 (2008)(term "factor" implies that when judges review lawfulness of benefit denial, they

12

will take account of several different considerations including conflict of interest). Likewise, if the issue before the Court involves an aspect of the Plan that gives little discretion to the Administrator, the specific provisions at issue may also be considered in determining the reasonableness of the decision.

> D. <u>Findings as to the Reasonableness of the Action</u>

In defending the actions of the Plan Administrator, the Employee Benefits Committee relies on an August 25, 2000 telephone conversation, a letter dated September 26, 2000, and another telephone conversation on September 29, 2000. According to the Employee Benefits Committee, plaintiff was advised in the telephone call on August 25, 2000, that he could move the money from the ESF II to another fund contingent upon the completion of the investigation, but plaintiff elected to leave the money in the ESF II. (A.R. 000098) The Court has reviewed the transcripts of this call. (Plaintiff's Fact #29[7]) Initially, plaintiff indicated that:

> JS ... I mean telling me it's not allowed, you void the damn thing out. We start from zero. You know, I mean we revert back because; I don't know. I'd have to talk to my lawyer at this point. With Lucent I've added [had] a number of problems on screw up and they've all been adverse.
>
> KD Uh-huh.
>
> JS And I, so, you know, anything you want to do in that area, I'll want in writing. There's a problem there some place. Uh, if it's to my advantage, fine, but if it's going to go the other way, then I said I'm going to play hardball and you would too if you were in my shoes, right?
>
> KD Well, uh, yeah, I understand your point there.
>
> JS If it shouldn't have taken place, it shouldn't have taken place.

---

[7]As noted, there are two transcripts of this call. (<u>See</u> A.R. 000213-000221 and A.R. 000148-000153) The transcripts, although not identical, are similar with the exception that the 2006 transcript omits a portion of the call.

13

(Plaintiff's Fact #29; A.R. 000152-000153) When plaintiff asked what would happen to the July 27 transaction, he was told it would depend on the outcome of the investigation which would take three to five business days. He was told he could leave the money alone until the investigation was finished, which he ultimately agreed to do. (Plaintiff's Fact #29; A.R. 000219) Plaintiff was told at least twice that he would be given a call following the investigation of the July 27 transaction. (Plaintiff's Fact #29; A.R. 000219)

Despite the representation that plaintiff would be called with the outcome of the investigation, the next contact plaintiff had with defendant or it representatives was not until September 29, 2000, when plaintiff received a letter from the Lucent Savings Plan Service Center. (Plaintiff's Fact #32) The form letter, directed to Lucent Savings/401(k) Plan Participant, and received by plaintiff on September 29, 2000, indicated that on Tuesday, September 26, 2000, the non-company matching contributions and their related earnings had been transferred from the ESF II to the LSF. (Plaintiff's Fact #36)

Upon receipt of this letter, plaintiff telephoned what he thought was the Lucent Savings Plan Service Center; he actually reached Fidelity and spoke with Jennifer Burgeson. (Plaintiff's Fact #37) Plaintiff repeatedly suggested that Lucent should not second guess what he wanted. "Now, if you say that wasn't right, and I told them over a month ago, if that's what you want to do, just reverse the transaction." (A.R. 000223; See Plaintiff's Fact #44 for a summary of the transcripts of the September 29, 2000 call) After repeating his statements that he wanted it turned back, the following discussion occurred:

> JB    If you weren't able to invest in Employee Share Fund II, did you want the money to stay?
>
> S    I want it to stay where it was at.

14

JB    In which fund?

S    It was in the– ... (inaudible), I've got what name you got for it. ...

JB    Let's see, were they Stable Value Funds?

S    Yeah, Stable Value.

(A.R. 000225-000226)

Whether the decision to transfer funds from ESF II to the LSF for all plan participants without contacting them was reasonable is not before the Court. The issue in this case is what was reasonable given the contacts between Fidelity and plaintiff. According to defendant, the July transaction violated the terms of the Plan, some corrective action was required, and plaintiff refused to initiate corrective action. (Doc. #55 at 14; Doc. #62 at 9) However, defendant's position ignores a substantial part of the record. First, in the only phone call between plaintiff and representatives of defendant prior to corrective action being undertaken, plaintiff was told he could make a contingent trade or leave the funds alone pending the outcome of the investigation. (Plaintiff's Fact #29; A.R. 000219) Plaintiff was also repeatedly told he would be given a call once the investigation was concluded. (Id.) Thus, there is no support in the record for any claim that defendant was compelled to transfer the funds on September 26, 2000 from the ESF II because plaintiff refused to take corrective action. The undisputed evidence is that plaintiff was never contacted after the telephone call of August 25, 2000, following the conclusion of the investigation and before defendant unilaterally undertook the corrective action of September 26, 2000.

The Employee Benefits Committee's decision and the briefing of defendant suggests that because plaintiff was demanding that the transaction in its entirety be reversed and all of the funds returned to the SVF, the action taken on September 26, 2000 was necessary to avoid giving plaintiff

15

an "unwarranted windfall." However, defendant does not explain why a transfer back to the SVF, minus any windfall, was not possible. During the telephone calls, plaintiff strongly voiced his belief that the entire transaction should be reversed as of July 27, 2000. It is clear from these calls that he wanted the money returned to the SVF. In fact, transferring the funds to the LSF was not offered as an option to plaintiff during the August 25, 2000 call. At that time, plaintiff was told his choice was a contingent trade to the SVF, or leaving the funds in the ESF II pending the outcome of the investigation.

Defendant repeatedly argues that the July 27, 2000 trade violated the terms of the Plan, as if to suggest that plaintiff has forfeited the right to give instructions as to the disposition of the funds transferred in violation of the Plan. However, the circumstances suggest that plaintiff did not understand that the transaction was prohibited at the time it was made, nor did numerous other Plan participants who also mistakenly transferred employee contributions to the ESF I and II. (A.R. at 000329) Once the mistake was discovered, there does not appear to have been any impediment to representatives of the Plan contacting plaintiff to request a specific designation of the fund to which the corrective transfer should be made. Had the plaintiff failed to provide a directive in response to a specific request, then the servicing agent for the Plan Administrator could have selected a default fund, such as the LSF, to which all improperly held contributions would be transferred. Alternatively, plaintiff could have been notified that if he failed to take corrective action by a date certain, the funds improperly held by the ESF II would be transferred to the LSF.

Given the multiple provisions of the Plan that stress the self-directed nature of the employee contributions, such inquiries or advance notification would appear to be consistent with the Plan. Even the service bulletin appeared to contemplate that investors making a prohibited transaction

16

would have the opportunity to redirect the funds that had mistakenly been put in the ESF I and II. The bulletin not only stated that all of the prohibited transfers would be reversed, but advised the servicing agents that if the participant wanted to put money into Lucent Stock, the representative should have them use the Lucent Stock Fund. (Plaintiff's Fact #33) The servicing representatives also appeared to recognize that plaintiff had a role in deciding where the money should be transferred as they promised they would contact him following the outcome of the investigation and before any further action was taken. The record is void of any explanations as to what further investigation was undertaken after August 25, 2000, when the investigation was completed, what the conclusions of the investigation were, why the reversal of the transaction as contemplated by the initial bulletin was not followed, or why plaintiff was not contacted as promised.

Plaintiff points to the $32,000,000 that was improperly transferred by 880 participants into ESF I and II as evidence that defendant was operating under a conflict of interest. Plaintiff claims that defendant had an interest in ensuring that this money was maintained in Lucent stock rather than being transferred to another investment. Defendant responds that plaintiff never elaborates on the conflict of interest and that it is an "empty allegation." (Doc. #62 at 6) However, defendant never denied that it had an interest in keeping the employee contributions invested in Lucent stock rather than transferring the funds from Lucent stock into another investment vehicle, such as the SVF.

Defendant also contends that the alternative basis for adopting a less stringent abuse of discretion standard, a procedural irregularity, does not exist. Defendant claims that the only procedural irregularity discussed by plaintiff concerns the actions of the servicing agent, Fidelity, in not contacting plaintiff between the call of August 25, 2000 and the transfer of contributions on

17

September 26, 2000. (Doc. #62 at 6) According to defendant, the procedural irregularity required by Woo must be an irregularity by Lucent rather than the servicing agent. (Doc. #61 at 5; Doc. #62 at 6) After the Eight Circuit decision in Hackett, a procedural irregularity is not a prerequisite for considering a conflict of interest. However, in considering all of the facts surrounding the review process, it appears that defendant's actions during the administrative review process did not fully comply with the requirements of the Plan.

The Court's Order staying proceedings pending administrative review indicated that the parties could treat the date of the order, December 6, 2005, as the date on which the claim seeking administrative review was submitted. Under the Plan, the Senior Plan Administrator had 90 days from receipt of the claim to notify the Participant of the denial of the claim. (Article 11.6(a) of the Plan, A.R. 000068-000069) In special circumstances, the Senior Plan Administrator can request an extension beyond the 90 days, but in no event is the extension allowed to exceed an additional 90 days. (Article 11.6(b) of the Plan, A.R. 000069) The Court was advised that the Plan Administrator had exercised its right to an additional 90-day extension. Thus, a decision should have been communicated to plaintiff by June 2006. Despite the unequivocal nature of this section, the Plan Administrator did not issue a denial until February 26, 2007, more than one year after the December 6, 2005 appeal date. While the failure to issue a decision may be treated as a denial of the claim thereby allowing a claimant to request a review of this denial, in the circumstances of this case, such a request would have defeated the purpose of the stay issued by the Court. According to defendant, its purpose in requesting a stay pending administrative proceedings was to allow for the creation of an administrative record which record could be reviewed on appeal.

The evidence indicates that representatives of defendant: (1) allowed an unauthorized

18

transaction to occur; (2) upon discovering the unauthorized transaction, promised to respond to plaintiff within three to five business days of the August 25, 2000 phone call; (3) did not respond to plaintiff within three to five business days with the results of the investigation as promised; (4) took action with respect to plaintiff's employee contributions without contacting him and notified him by letter only after the action had been taken; (5) when plaintiff called on September 29 in response to the letter notification, despite plaintiff's clear indication that he wanted the money returned to the SVF, did not do so, but opened a further investigation; and (6) after the filing of the complaint, requested a stay of the proceedings pending completion of the administrative review process, but then ignored the administrative deadlines established by the Plan for such review. Based on the totality of the facts presented, the Court concludes that in the circumstances of this case, the servicing agent's failure to follow its initial bulletin and plaintiff's request and return the funds to the SVF and defendant's decision to uphold that action constitute an abuse of discretion.

The final issue is the appropriate remedy in this situation. Plaintiff initially requested that his shares in the SVF be restored to the position they would have been had the defendant followed his investment directions. (Doc. #57 at 37) Defendant maintains that plaintiff could have asked for or accepted contingent trades of his stock into the SVF at any time and that he had an "unfettered opportunity to mitigate his alleged damages." (Doc. #61 at 12; Letter of May 8, 2008 at 2) Thus, defendant argues that it should not be held responsible for the decline in the value of the stock after it was transferred to the LSF.

The July 27, 2000 transfer of $100,664.35 from the SVF to the ESF II purchased 2,517.867 ESF II shares at a per share value of $39.98. (Plaintiff's Fact #55) Of the 2,517.867 shares purchased, 1,982.514 were shares representing plaintiff's employee contributions. (Id.) Between

19

July 27 and August 25, 2000, the value of the ESF II shares declined from $39.98 to $35.06. (Plaintiff's Fact #56) Between August 25 and September 26, 2000, the value of the ESF II shares declined from $35.06 to $26.12. (Plaintiff's Fact #57)

The Court concludes that although defendant's agents should not have processed plaintiff's July 27, 2000 investment request, at least with respect to the employee contributions, this investment decision was made by plaintiff. Thus, defendant should not bear the responsibility for any losses resulting from this initial decision. However, by August 25, 2000, defendant was aware that a prohibited transfer had occurred and plaintiff was requesting that the transaction be reversed and the shares returned to the SVF. At that time, the 2,517.867 shares in the ESF II fund would have been worth $88,276.42.

Accordingly, for the reasons set forth in this Order, it is

ORDERED that Plaintiff's Motion for Summary Judgment (doc. #56) is granted. It is further

ORDERED that plaintiff is awarded $88,276.42, less the market value of any of the 2,517.867 shares in question currently owned by plaintiff and less the value received if any of the 2,517.867 shares in question were previously sold by plaintiff. It is further

ORDERED that plaintiff's counsel is given thirty days in which file a request for attorney fees. Defendant is given thirty days thereafter in which to oppose the request. It is further

ORDERED that Defendant Lucent Technologies, Inc.'s Motion for Summary Judgment (doc. #54) is denied.

                                                     */s/ Sarah W. Hays*
                                                     SARAH W. HAYS
                                 UNITED STATES MAGISTRATE JUDGE